```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 30, 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JOSEFINA VALLE and WILFREDO VALLE,
individually and on behalf of all others
similarly situated,

                    14-cv-7993 (KBF)

                Plaintiffs,

                    OPINION & ORDER

                -v-

ATM NATIONAL, LLC
d/b/a ALLPOINT NETWORK,
CARDTRONICS, INC. and
POPULAR COMMUNITY BANK
f/k/a BANCO POPULAR NORTH AMERICA
a/k/a BANCO POPULAR NORTH AMERICA,

                Defendants.

------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On October 3, 2014, plaintiffs filed this putative class action claiming that defendants improperly charged ATM fees and surcharges for using the Allpoint Network of ATMs. (ECF No. 1.) The Complaint alleges violations of the federal Electronic Funds Transfer Act ("EFTA") and banking Regulation E, unjust enrichment, and New York General Business Law ("GBL") § 349 and § 350. On October 20, 2014, defendant Popular Community Bank f/k/a/ Banco Popular North America ("BPNA") gave plaintiffs written notice of its election to arbitrate the dispute. (Nieland Decl. ¶ 2, Ex. 1.) Four days later, plaintiffs filed an Amended Complaint wherein they abandoned their breach of contract claim and limited their claims to a time-period ending December 31, 2013, the month before plaintiffs'

1

account agreements had been amended to add an arbitration provision. (ECF No. 12.)

On December 2, 2014, BPNA moved to compel arbitration on the ground that plaintiffs and BPNA are parties to an agreement giving either party the right to compel arbitration of their disputes. (ECF No. 28.) On December 8, 2014, remaining defendants Cardtronics and ATM National, LLC d/b/a Allpoint Network made substantively the same motion to compel arbitration. (ECF No. 44.) Cardtronics and Allpoint rely on plaintiffs' arbitration agreement with BPNA which states that plaintiffs agreed to arbitration with "not only the Bank" but also with "any party named as a co-defendant with us in a Claim asserted by you." (Contract at 10, ECF No. 34-2.) Accordingly, if the claims against BPNA must be arbitrated, so must the claims against the remaining defendants.

Separately from the arbitration motions, Cardtronics and Allpoint filed a motion to dismiss on December 2, 2014. (ECF No. 25.) On December 8, 2014, the Court stayed discovery of all kind pending resolution of the motion to compel arbitration. (ECF No. 43.)

For the following reasons, the Court GRANTS the motions to compel arbitration.

I.   BACKGROUND

In September 1999, plaintiff Josefina Valle opened a savings account with BPNA in her name and in trust for her son, plaintiff Wilfredo Valles. (Compl. ¶¶ 10-11.) Neither party has been able to produce the contract in existence when

plaintiffs' account was opened.  (Randazzo Decl. ¶ 4, ECF No. 33.)  In July 2010, BPNA announced that its deposit account customers could use thousands of Allpoint Network ATMs for "Free" and without being subject to ATM fees or surcharges by wither BPNA or Allpoint.  (Compl. ¶ 28.)  Despite Allpoint, Cardtronics and BPNA each representing the use of those ATMs as "free" and not subject to ATM fees or surcharges (Id. ¶¶ 29-31, 34-36), plaintiff alleges that each defendant ultimately imposed such fees (Id. ¶¶ 44-45).

In January 2014, BPNA issued a Personal Banking Disclosure and Agreement to its deposit account holders explaining that an Amended Agreement would become the operative agreement between BPNA and its deposit account holders.  (Staker Decl. ¶ 3, Ex. 1 ("January 17 Letter").)   The Amended Agreement contained an Arbitration Provision and Class Action Waiver ("Arbitration Provision") giving either party the right to arbitrate any "Claim" arising from "this Agreement or the deposit account."  (Amended Agreement at 8.)  A "Claim" is defined as including any "legal claim, dispute or controversy" that:

> Arises from or relates in any way to . . . the deposit account including: . . . (ii) the fees or charges we or other parties impose in connection with . . . the deposit account . . . (v) any service or product offered or made available by or through us . . . including any associated fees, charges, terms or disclosures; and (vi) any documents, instruments, advertising or promotional materials that contain information about this . . . deposit account, or any other such service or product.  "Claim" includes, without limitation, disputes concerning the validity, enforceability, arbitrability or scope of this Arbitration Provision or this Agreement, disputes involving alleged fraud or misrepresentation,

>breach of contract, negligence or violation of statute, regulation or common law; and disputes involving requests for injunctions or other equitable relief.

(Id. at 9-10.)

In the one-page January 17 Letter, BPNA said that deposit account holders could reject the Amended Agreement "by closing your account and withdrawing your funds within sixty (60) days of the date of this notice." (January 17 Letter.) The Amended Agreement also specified that deposit account holders could opt out of the Arbitration Provision by mailing a signed rejection notice to BPNA within 45 days of receipt of the Amended Agreement. (Amended Agreement at 8-9.) Plaintiffs took no affirmative action to reject either the Amended Agreement or the Arbitration Provision, and continued to use their account until June 27, 2014. (Randazzo Decl. ¶ 7.) They nonetheless allege that they "have not entered into any valid or enforceable agreement(s) to arbitrate any claim alleged in this action, with any defendant." (Am. Compl. ¶ 50.)

II.   LEGAL STANDARD

"[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., "creates a body of federal substantive law of arbitrability applicable to arbitration agreements . . . affecting interstate commerce." Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran, 445 F.3d 121, 125 (2d Cir. 2006) (internal quotation marks omitted). The

4

parties do not dispute that the agreement at issue here affects interstate commerce and, accordingly, the FAA applies.

The Second Circuit has previously noted that "it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied." Arciniaga v. Gen. Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006) (internal quotation marks omitted). Whether a dispute should be arbitrated depends on "'(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement.'" Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001) (quoting National Union Fire Ins. Co. v. Belco Petroleum Corp., 88 F.3d 129, 135 (2d Cir. 1996)). The FAA provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Accordingly, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." Ragone v. Atlantic Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681 (1996)).

III. DISCUSSION

At issue is whether the arbitration provision in the Amended Agreement is valid and binding on plaintiffs. Plaintiffs challenge the validity of the Amended

5

Agreement and Arbitration Provision on several grounds.  They fail to assert an appropriate legal challenge with each attempt.

  A. <u>Mutual Assent</u>

Using basic contract principals, it is evident that plaintiffs assented to the Amended Agreement and the Arbitration Provision.  Courts have held that customers accept revised terms of their accounts by continuing to use their accounts after receiving the revised terms.  See <u>Anonymous v. JP Morgan Chase & Co.</u>, No. 05 Civ. 2442 (JGK), 2005 WL 2861589, at *4 (S.D.N.Y. Oct. 31, 2005) ("uncontested evidence that the plaintiff used the Chase card and made payments to Chase for that use for several months" meant that "plaintiff agreed to the terms of the Arbitration Agreement"); <u>Kulig v. Midland Funding, LLC</u>, No. 13 Civ. 4715 (PKC), 2013 WL 6017444, at *6 (S.D.N.Y. Nov. 13, 2013) ("Although the use of a credit card constitutes acceptance of an offer of credit, merely continuing to owe money on a credit card account cannot reasonably be understood to be an 'objective manifestation of intent' that binds the parties to a change in terms.") (internal citation omitted); <u>Tsadilas v Providian Natl. Bank</u>, 13 A.D.3d 190, 190 (1st Dept 2004) ("Defendant sufficiently proved that it sent the arbitration provision to plaintiff.  Plaintiff consented to it by failing to opt out and by continuing to use her credit cards.  Plaintiff is bound by the arbitration provision even if she did not read it . . .") (internal citations omitted); <u>In re Hood</u>, 449 Fed. Appx. 507, 509 (7th Cir.

2011) (plaintiff "would have accepted [AMEX's amended account agreement] by continuing to use her credit card").

Here, BPNA sent the Amended Agreement and an explanatory one-page cover letter to its customers on January 17, 2014. That letter highlighted that the Amended Agreement would supersede any previous agreement and specifically pointed out the new Arbitration Provision. (January 17 Letter.) The letter stated that customers could reject the Amended Agreement altogether by closing their account within 60 days. The Amended Agreement stated that customers could also reject the Arbitration Provision by sending a signed arbitration rejection notice to BPNA within 45 days. (Amended Agreement at 8-9.) Plaintiffs did neither and continued to use their account through June 27, 2014.

Plaintiffs, however, assert that continued use of the account did not constitute acceptance of the Amended Agreement. They rely on Schnabel v. Trilegiant Corp., 697 F.3d 110 (2d Cir. 2012). The plaintiffs in that case paid a monthly fee to a discount program, which subsequently tried to add an arbitration clause with no opt-out right in an email to its members. Id. at 113-17. Plaintiffs continued paying the membership fees automatically billed to their credit cards, but did not use the discounts. The Second Circuit held that the automatic credit card payments were "too passive" to constitute acceptance. Id. at 128. "We do not think that an unsolicited email from an online consumer business puts recipients on inquiry notice of the terms enclosed in that email and those terms' relationship to a service in which the recipients had already enrolled, and that a failure to act

7

affirmatively to cancel the membership will, alone, constitute assent." Id. at 123. Rather than burying the arbitration provision in an unexpected email, here BPNA mailed the Amended Agreement to the address regularly used to communicate with its customers. It also highlighted the arbitration provision on the first page of the Agreement and in the letter. In addition, where automated payments were insufficient for finding assent in Schnabel, here plaintiffs actively used their account over the course of several months with ATM transactions. Unlike in Schnabel, here there was an express opt-out provision that plaintiffs declined to exercise. BPNA gave plaintiffs sufficient opportunity to reject the Amended Agreement and the Arbitration Provision, but they chose not to do so.

B. "Change of Terms" Provision

Plaintiffs argue that BPNA was limited in how it could amend the account agreements with its customers because of a "change of terms" provision in earlier agreements. Relying on a California state court decision, plaintiffs argue that nothing in BPNA's original contract terms would have alerted a customer that it might one day use the change of terms provision to impose arbitration on the customer. See Badie v. Bank of Am., 67 Cal. Capp. 4th 779, 796-97 (1998) ("[P]ermitting the Bank to exercise its unilateral rights under the change of terms provision, without any limitation on the substantive nature of the change permitted, would open the door to a claim that the agreements are illusory."); see also Follman v. World Fin. Network Nat'l Bank, 721 F. Supp. 2d 158 (E.D.N.Y. 2010) (applying Ohio state law); Stone v. Golden Wexler & Sarnese, P.C., 341 F.

Supp. 2d 189, 192 n.1 (E.D.N.Y. 2004) (applying Virginia state law but noting that "the result would be materially the same under either New York or Virginia law"). In <u>Stone</u>, however, the court acknowledged that the bank need not rely on the "change of terms" provision to make valid an arbitration provision, but may show an enforceable agreement to arbitrate through proof it was offered to the customers and the customers accepted it by continuing to use their account. <u>Stone</u>, 341 F. Supp. 2d at 192 ("To be sure, a party may propose, and the other party may accept, an alteration to an existing contract.") As described above, the parties assented to the Amended Agreement. In addition, the primary concern of <u>Badie</u> and related cases in springing unexpected terms on the customer is alleviated here where plaintiffs had ample opportunity to opt-out of the Arbitration Provision after receiving sufficient notice of the new terms.

Nonetheless, plaintiffs additionally assert that BPNA violated the "change of terms" provision because plaintiffs did not have enough notice before the changes became effective. Prior agreements required BPNA to notify customers "in writing at least 21 days before the effective date of a change." (Tusa Decl., Exs. D-G.)[1] The parties differ on the date by which the Amended Agreement became effective. The January 17 Letter states:

> If, after reviewing the Amended Account Agreement, you decide that the terms are unacceptable to you in any way, you may opt out of it by closing your account and withdrawing your funds within sixty (60) days of the date of this notice. Otherwise, you will be deemed to have accepted the Amended Account Agreement on the earlier of (1) your first use of your deposit account

---

[1] An even earlier agreement required 30 days' notice before a change became effective.

after five (5) days from the date of this notice or (2) sixty (60) days from the date of this notice.

(January 17 Letter.) Plaintiffs used their account on January 31, 2014 to make an ATM withdrawal, and argue that the effective date was thus a mere 14 days after January 17, 2014. They rely on dictum in Filho v. Safra Nat'l Bank, 489 F. App'x 483, 486 n.4 (2d Cir. 2012) suggesting changes to account terms may be invalid if customers are not given sufficient time to reject the new terms. In Filho, the bank could not prove that it provided the plaintiff with 10 days' notice, as required in the original agreement. In contrast to the 10-day period at issue in Filho, BPNA gave plaintiffs 60 days to reject the Amended Agreement by closing their account. Even if the parties were bound by the 21 day requirement in the "change of terms" provision, plaintiffs had 60 days if they took no other affirmative action before the Amended Agreement became effective. This time period offered sufficient notice of the changes.

    C. Proof of Mail

Plaintiffs challenge BPNA's proof that the Amended Agreement was mailed to plaintiffs, stating that Josefina Valle did not recall receiving the mailing. (Decl. of Josefina Valle ¶ 8.) Their challenge is insufficient. See Meckel v. Cont'l Res. Co., 758 F.2d 811, 817 (2d Cir. 1985) ("mere denial of receipt" does not rebut the presumption of proper mailing). There is a presumption that a mailing is received if "affidavits as to the regular office mailing procedures" show that mail was properly addressed and delivered to the U.S. Postal Service. Leon v. Murphy, 988 F.2d 303, 309 (2d Cir. 1993); Manigault v. Macy's East, LLC, 318 F. App'x 6, 7 (2d Cir. 2009).

10

Ronald Losoya, an employee of ABS Graphics, Inc. submitted such a declaration outlining the mailing procedures for sending BPNA customer mailings. The same addressed was used on BPNA's other mailings to plaintiffs, and this particular mailing was not returned as undeliverable. (Losoya Decl. ¶¶ 7, 11.) Losoya's affidavit sufficiently demonstrates that plaintiffs received notice of the new terms. See Mohammed v. Great Atl. & Pac. Tea Co., 13 Civ. 2248, 2014 WL 4058708, at *4 (S.D.N,Y. Aug. 15, 2014) ("an affidavit submitted by an individual who supervised the mailing is sufficient") (internal citation omitted).

    D.  Retroactive Application of the Arbitration Provision

Plaintiffs contend that even if the Arbitration Provision is valid, it does not apply to claims based on conduct that pre-dates the Amended Agreement. The operative Complaint limits plaintiffs' claims to a time-period ending December 31, 2013, the month before plaintiffs' account agreements had been amended to add the Arbitration Provision. The Arbitration Provision, however, makes clear that it applies to any "Claim[s]" involving "the deposit account." (Amended Agreement at 9-10.) The Arbitration Provision applies to all of plaintiffs' claims, even if they pre-date the Amended Agreement, because the Arbitration Provision expressly states its applicability to any legal claim arising from the deposit account. "The Second Circuit has held that arbitration clauses without an express limitation to 'future disputes' should be applied to preexisting claims." Reid v. Supershuttle Int'l, Inc., 08-CV-4854 (JG) (VVP), 2010 WL 1049613, at *5 (E.D.N.Y. Mar. 22, 2010) (citing Coenen v. R.W. Pressprich & Co., 453 F.2d 1209, 1212 (2d Cir. 1972);

11

Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 99 (2d Cir. 1999)); Williams v. Joseph Dillon & Co., 243 A.D.2d 559, 560 (2d Dep't 1997) (language referring to "any controversy" includes transactions that pre-date that contract). When plaintiffs assented to the new Arbitration Provision, they agreed to arbitrate any claim arising from the deposit account, including the current dispute regarding ATM fees.

    E.  Illusory and Unconscionable

Plaintiffs assert that the "change of terms" provision in the Amended Agreement giving BPNA the exclusive right to change its terms renders the Amended Agreement illusory. The parties dispute whether this question must be resolved by the arbitrator or by this Court. Either way, this Court does not find the contract to be illusory. Plaintiffs cite cases outside this Circuit for the proposition that an agreement is illusory if only one party to an arbitration agreement is vested with absolute power to change the terms of the agreement. See, e.g., Douglas v. Johnson Real Estate Investors, LLC, 470 F. App'x 823, 825 (11th Cir. 2012); Carey v. 24 Hour Fitness, USA, Inc., 669 F.3d 202, 205 (5th Cir. 2012). However, the "change of terms" provision here does not give BPNA absolute power, but instead states that BPNA "may change, amend or supplement this Agreement at any time as allowed by applicable law." (Amended Agreement 14.) That "applicable law" is New York law, which constrains BPNA's discretion to change contractual terms with standard principles of contract law and the implied covenant of good faith. BPNA's discretion to change the terms is thus limited. Indeed, plaintiffs cannot

preemptively challenge the "change of terms" provision for being illusory before BPNA has even invoked the provision, as New York courts will "examine[] the reasonableness of a defendant's behavior before holding a contract to be illusory." Lebowitz v. Dow Jones & Co., 847 F. Supp. 2d 599, 604 (S.D.N.Y. 2012), aff'd, 508 F. App'x 83 (2d Cir. 2013).  This challenge is premature.

Plaintiffs also assert that the Arbitration Provision is unconscionable.  It primarily challenges the provision in the Amended Agreement whereby the losing party in a dispute pays the prevailing party's fees, as that amount would dramatically outweigh the $300 to $400 of injuries plaintiffs claim resulted from the ATM fees and surcharges.  The provision reads:

> The losing party must pay the expense of the prevailing party's attorneys, experts and witnesses and, if we lose, we will also pay all fees charged by the Administrator and the arbitrator(s) as well as all reasonable fees of your attorneys. In all cases, we will pay all fees and costs (including attorneys' fees) that we are required to bear under applicable law and/or in order for us to enforce this Arbitration Provision.

(Amended Agreement at 9.)  Under New York law, an unconscionable contract is one which "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms."  Gillman v. Chase Manhattan Bank, N.A., 534 N.E.2d 824, 828 (N.Y. 1988). "For a contract to be held unconscionable, the party alleging the defect must generally show both substantive and procedural unconscionability." Clinton v. Oppenheimer & Co. Inc., 824 F. Supp. 2d 476, 483 (S.D.N.Y. 2011).

Procedurally, the provision is not unconscionable as plaintiffs had 45 days to opt out of the Arbitration Agreement and 60 days to opt out of the Amended

Agreement. See Nayal v. HIP Network Services IPA, Inc., 620 F. Supp. 2d 566, 571-72 (S.D.N.Y. 2009) (finding that even if an arbitration provision was in a form contract offered on a "take-it-or-leave-it" basis, "this is not sufficient under New York law to render the provision procedurally unconscionable"). In addition, inequality in bargaining position "is not alone sufficient to hold arbitration agreements unenforceable" without being "coupled with high pressure tactics that coerce [a signatory's] acceptance of onerous terms." Brennan v. Bally Total Fitness, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002) (citations omitted) (dealing with arbitration terms in an employment contract). No such tactics are alleged here. The Arbitration Provision was also not hidden from plaintiffs as BPNA highlighted the change on the first page of the Amended Agreement and in the January 17 Letter. They had the opportunity to close their accounts and take their business elsewhere.

Substantively, however, the "loser pays" provision is unconscionable under the facts proffered. Plaintiffs argue that the risk of paying a large amount of fees "serves as an obvious and onerous deterrent" to their ability to pursue these claims. (Pl. Opp'n at 23.) In balancing the concerns over cost with the presumption in favor of arbitration, the plaintiff has the burden of demonstrating the "likelihood of incurring such [prohibitive] costs". See Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79, 91-92 (2000) (holding that the mere risk of such "prohibitive cost is too speculative to justify the invalidation of an arbitration agreement" but

declining to set forth the detail with which a party must make a showing).[2]  Most federal courts, including most federal and state courts in New York, have adopted a "case-by-case approach" requiring "a showing of individualized prohibitive expense" that considers factors including the financial means of plaintiff and the cost differential between arbitration and litigation in court.  See Brady v. Williams Capital Group, L.P., 64 A.D.3d 127, 133-34 (1st Dept 2009), aff'd 928 N.E.2d 383 (N.Y. 2010) (collective cases).  In Brady, the court found that the fee-splitting provision of an employment arbitration agreement was substantively unconscionable given the cost of $21,150 to a plaintiff who had earned between $100,000 and $405,000 in the prior five years but was then unemployed.  Id. at 135-36; see also Matter of Schreiber v. K-Sea Transp. Corp., 9 N.Y.3d 331, 341 (N.Y. 2007) (finding $10,000 cost to arbitrate "prohibitively expensive").

Here, plaintiffs have even less money to pay all the fees they would owe if they lost the arbitration case.  They proffer that plaintiff Josefina Valle's only source of income are social security and disability payments totaling $828 monthly and her sole bank account has not exceeded $571 in the prior five months.  (J. Valle Decl. ¶¶ 1, 4-5, ECF No. 33-3.)  Plaintiff Wilfredo Valle earns a modest salary as a janitor in the New York City school system.  (W. Valle Decl. ¶ 4.)  They also set forth information on the number of defense lawyers and the hourly rate of $590 for one of the lawyers to estimate a potential cost of tens of thousands of dollars.  (Tusa

---

[2] Defendants' use of Am. Express Co. v. Italian Colors Restaurant, 133 S. Ct. 2304 (2013), is inappropriate as that case concerned a class action waiver, not a "loser pays" provision in an agreement to arbitrate.

Decl., Ex. H.) Under these facts, plaintiffs have met the burden of showing that arbitration would be prohibitively expensive, as the risk of losing could effectively render them bankrupt.

As the "loser pays" provision is substantively unconscionable, the "appropriate remedy is to sever the improper provision of the arbitration agreement" and not to invalidate the entire Arbitration Provision. Brady, 64 A.D.3d at 137. By nullifying the objectionable "loser pays" provision, this Court will not be overriding the intent of the parties to arbitrate.

IV. CONCLUSION

For the foregoing reasons, defendants' motions to compel arbitration are GRANTED. The "loser pays" provision is severed from the agreement, as described above. The motion to dismiss by Cardtronics, Inc. and ATM National, LLC d/b/a Allpoint Network, filed on December 2, 2014, is therefore rendered moot.

The Clerk of Court is directed to close the motions at ECF Nos. 25, 28 and 44 and terminate this action.

SO ORDERED.

Dated: New York, New York
January 30, 2015

_____
KATHERINE B. FORREST
United States District Judge